UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM FILLYAW | Case No. 23 CR 650<br><br>Judge Matthew F. Kennelly |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: */s/ Kirsten Moran*
KIRSTEN MORAN
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 722-2291

Dated: June 7, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 1

III. DEFENDANT'S MOTION TO SUPPRESS .......... 1

A. The Backpack Was Opened on Scene Prior to Transport in Line with FBI Practice and Inventoried Consistent with Written FBI Inventory Procedure. .......... 3

B. Written Inventory Policies and Procedures Would Have Inevitably Led to the Discovery of the Items in Defendant's Backpack .......... 8

C. The Search Incident to Arrest Exception is Supported by Seventh Circuit Case Law .. 11

IV. CONCLUSION .......... 15

## TABLE OF AUTHORITIES

**Cases**

*Chimel v. California*, 395 U.S. 752 (1969) .......... 11

*Colorado v. Bertine*, 479 U.S. 367 (1987) .......... 3, 4, 5, 8

*Illinois v. Lafayette*, 462 U.S. 640 (1983) .......... 3, 5

*Nix v. Williams*, 467 U.S. 431 (1984) .......... 8, 9, 10

*Riley v. California*, 573 U.S. 373 (2014) .......... 11

*South Dakota v. Opperman*, 428 U.S. 364 (1976) .......... 3

*United States v. Askew-Bell*, 306 Fed.Appx. 292 (7th Cir. 2009) .......... 11, 12, 13

*United States v. Cartwright*, 630 F.3d 610 (7th Cir. 2010) .......... *passim*

*United States v. Davis*, 997 F.3d 191 (4th Cir. 2021) .......... 14, 15

*United States v. Harris*, 2009 WL 3055331 (N.D.Ill. Sep. 21, 2009) .......... 12

*United States v. Isaac Mallory*, 19 CR 857 (NSR), Dkt. 121 (S.D.N.Y. 2020) .......... 5

*United States v. Lomeli*, 76 F.3d 146 (7th Cir. 1996) .......... 7

*United States v. Markling*, 7 F.3d 1309 (7th Cir. 1993) .......... 9

*United States v. Marrocco*, 578 F.3d 627 (7th Cir. 2009) .......... 9

*United States v. Pelletier*, 700 F.3d 1109 (7th Cir. 2012) .......... 8

*United States v. Salazar*, 69 F.4th 474 (7th Cir. 2023) .......... 13, 14, 15

*United States v. Sanchez*, 2019 WL 3216024 (N.D. Ill. July 17, 2019) .......... 13

*United States v. Tejada*, 524 F.3d 809 (7th Cir. 2008) .......... *passim*

*Whren v. United States*, 517 U.S. 806 (1996) .......... 8

**Statutes**

18 U.S.C. § 844(h) .......... 1

18 U.S.C. § 844(i) .......... 1

18 U.S.C. § 922(g)(1) .............................................................................................................. 2

18 U.S.C. § 924(c)(1)(A) .......................................................................................................... 2

21 U.S.C. § 841(a)(1)................................................................................................................ 2

## I. INTRODUCTION

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits this memorandum of law in opposition to the pretrial motion of defendant William Fillyaw. Dkt. 16. The defendant moves this Court to suppress the evidence recovered from Fillyaw's backpack. The defendant's motion is without merit and for the reasons set forth below, should be denied without a hearing.

## II. BACKGROUND

On October 28, 2022, William Fillyaw was arrested pursuant to a criminal complaint filed in the Eastern District of Wisconsin, charging Fillyaw with arson of a vehicle, in violation of 18 U.S.C. § 844(i) and use of arson in furtherance of another felony, in violation of 18 U.S.C. § 844(h). 22 CR 223, Dkt. 1. The criminal complaint detailed an investigation into a homicide that occurred in Waukegan, Illinois on October 3, 2022, in which two subjects exited a gray Dodge Charger and discharged numerous rounds of ammunition into a victim's vehicle, killing him. *Id.* at 1-2. The gray Dodge Charger fled at a high rate of speed, and approximately less than 90 minutes later, a gray Dodge Charger was found empty and fully engulfed in flames in Pleasant Prairie, Wisconsin. *Id.* At the time of Fillyaw's arrest on October 28, 2022, Fillyaw was charged in the criminal complaint related to the events surrounding the Dodge Charger. *Id.*

On the morning of October 28, 2022, law enforcement observed Fillyaw drive a maroon van into the parking lot of his apartment complex in Gurnee, Illinois. Govt. Ex. E at 3. Fillyaw retrieved a black backpack from the van, and began walking towards the entrance. *Id*. At approximately 8:45 a.m., law enforcement arrested Fillyaw, alone, in the parking lot of the residential building. Govt. Ex. E at 3; Govt. Ex. F. Fillyaw had the black backpack strapped to his back at the time of his arrest. Govt. Ex. E at 3. Law enforcement removed Fillyaw's backpack from his back approximately 25 seconds after law enforcement confronted him. Govt. Ex. F, FBI

Special Agent Nick Rupnick BWC (showing agents encounter Fillyaw at 2:04 and complete the removal of Fillyaw's backpack from his person at 2:29). Approximately 8 seconds after that, law enforcement secured the handcuffs on defendant. *Id*. (showing agents securing the handcuffs at 2:37). Less than two minutes after the backpack was removed, FBI Task Force Officer ("TFO") Brian Ploch opened the backpack, encountered contraband, and then proceeded to performed a thorough review of the items.[1] *Id.* (showing the opened backpack with TFO Ploch at 4:28). At the time of Fillyaw's arrest, law enforcement did not observe Fillyaw's significant other, and did not know which apartment Fillyaw lived in. Govt. Ex. G, clip of SA Dettmering BWC immediately prior to defendant's arrest ("Girlfriend's looking hard." "It's not her, it's a different girl."); Govt. Ex. H, clip of TFO Kazachenko BWC during portion of inventory search ("His girl just went back in, right? That wasn't his girl."); Govt. Ex. I, clip of TFO Kazachenko BWC during portion of inventory search ("He wants to call his people, I don't know which apartment it is.").

Defendant was taken into custody based on the Eastern District of Wisconsin warrant and appeared before Magistrate Judge Stephen C. Dries on October 31, 2022. 22 CR 223, Dkt. 3. Based on the items found in defendant's backpack, on December 19, 2023 defendant was charged in the Northern District of Illinois in a three count indictment with possession with intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1), possession of a gun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and possession of ammunition

---

[1] Defendant includes a footnote referencing the absence of Waukegan Police Department's body-worn camera. Dkt. 16 at 4-5. The FBI obtained additional body-worn camera from Waukegan Police Department on May 29, 2024, provided the materials to the U.S. Attorney's Office on June 3, 2024, which were produced to defense counsel on June 6, 2024. The additional discovery produced on June 6 is from the operation on October 28, 2022, but does not depict the portion of the arrest or backpack search at issue in defendant's motion, with the earliest video from 8:51 a.m. All of the facts cited herein are sourced from documents or video produced in discovery on either January 29, 2024 or February 29, 2024.

as a felon, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. Defendant now seeks to suppress the contraband found in his backpack.

## III. DEFENDANT'S MOTION TO SUPPRESS

Defendant's suppression argument claims that law enforcement needed a warrant or consent prior to opening a backpack that was on his person at the time of his arrest. This argument overlooks the routine, constitutional practice of inventory searches and the exception to the warrant requirement provided by the inevitable discovery doctrine. The evidence from the backpack was inventoried consistent with written FBI policy. While law enforcement sensibly opened the bag prior to transporting it, as is standard FBI practice to ensure officer safety, a hearing is not required to establish that practice: the evidence in the backpack would have been inevitably discovered during the mandatory inventory search required to be conducted by the FBI, pursuant to written policy. In addition, even if this Court finds that the search was not a lawful inventory search or that it would not have been inevitably discovered during the inventory search required by FBI policy, law enforcement's search of defendant's backpack was a lawful search incident to arrest. The defendant's motion should therefore be denied.

### A. The Backpack Was Opened on Scene Prior to Transport in Line with FBI Practice and Inventoried Consistent with Written FBI Inventory Procedure.

The Fourth Amendment prohibits "unreasonable searches and seizures" without warrants. U.S. Const. amend. IV. Inventory searches "constitute a well-recognized exception to the warrant requirement and are reasonable under the Fourth Amendment." *U.S. v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010) (citing *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976)). "[I]t is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed." *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983). Warrantless inventory searches may be conducted in order to protect the owner's property while

that property is in police custody, protect the police against claims of lost or stolen property, or protect the police from potential danger posed by the property. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

"An inventory search is lawful if: (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *Cartwright*, 630 F.3d at 613 (citing *U.S. v. Jackson*, 189 F.3d 502, 508-09 (7th Cir. 1999)).

Both elements are met here. First, the defendant was lawfully arrested pursuant to an arrest warrant and complaint signed by a federal magistrate judge in the Eastern District of Wisconsin. 22 CR 223, Dkt. 1. After the defendant's arrest, law enforcement seized his backpack, which was on his person at the time of the arrest.

Second, law enforcement's actions were consistent with the written inventory protocol set forth in the FBI's Domestic Investigations and Operations Guide ("DIOG"), relevant portions of which are attached as Govt. Ex. A. Under the DIOG, "As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents. A written summary of the inventory must be recorded in an FD-302, an FD-597 ('Receipt for Property'), or an FD-653 ('Motor Vehicle Inspection Inventory Record')." *See* Govt. Ex. A.

Here, after defendant's arrest but prior to his transport, TFO Ploch opened defendant's backpack. If called to testify, TFO Ploch would explain that he opened the backpack to ensure that no dangerous items needed to be secured prior to transporting the backpack. *Bertine*, 479 U.S. at 372 ("[G]uarding the police from danger" is one of the strong governmental interests underpinning the inventory search doctrine); *see also Lafayette*, 462 U.S. at 646 ("Dangerous instrumentalities—

such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession."). As the Supreme Court concluded, "[e]xamining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independent of a particular officer's subjective concerns." *Lafayette*, 462 U.S. at 646. Here, after opening the backpack, TFO Ploch encountered contraband.

The fact that TFO Ploch took this step to ensure officer safety before placing the backpack in a law enforcement transport vehicle is of no import: the Fourth Amendment does not require that police conduct inventory searches at any particular location. *See, e.g. Bertine*, 479 U.S. 367, 368-69 (1987) (upholding inventory search performed when the suspect was taken into custody, but before the tow truck arrived). Furthermore, TFO Ploch's actions were precisely aligned with one of the enumerated factors for an inventory search: to protect law enforcement from potential danger. *Bertine*, 479 U.S. at 372-73 (finding that knowledge of the precise nature of the property "helped to avert any danger to police or others that may have been posed by the property."). TFO Ploch's actions were also consistent with how other FBI employees implement the DIOG relating to inventory searches. *See, e.g. U.S. v. Isaac Mallory*, 19 CR 857 (NSR), Dkt. 121 (S.D.N.Y. 2020) (government detailing an arrest conducted by FBI consistent with the DIOG and stating that, "Prior to transporting the bag, law enforcement opened it, following normal practice, to ensure that no dangerous items needed to be secured prior to transporting the bag.").

If called to testify, TFO Ploch would state that he was aware that the defendant, who had just been arrested, would soon be placed in a vehicle with law enforcement for transport to a secure facility. Fillyaw was arrested alone, and law enforcement would not simply abandon his backpack

in a residential parking lot. As a result, law enforcement needed to ensure that his backpack did not contain anything dangerous that could harm law enforcement during the transport or make its way into the police station or jail facility. Indeed, this concern was not mitigated during FBI Special Agent ("SA") Dettmering's conversation with the defendant following his arrest: during a conversation when SA Dettmering asked the defendant whether there was anything in the backpack that was going to hurt anyone, the defendant replied, "Not now" and then stated, "No, no." Govt. Ex. J, clip of SA Dettmering BWC post-arrest.

After observing the contraband, TFO Ploch donned rubber gloves and confirmed that TFO Kazachenko should retrieve a camera. TFO Ploch then emptied defendant's backpack item-by-item and catalogued items while in the residential parking lot, with TFO Kazachenko photographing the items as TFO Ploch lifted them out. Govt. Ex. B (showing 41 photographs taken of the backpack and its contents while in the parking lot, and 4 additional photographs of the contents taken at the Waukegan Police Department). Those items were logged into a photograph evidence log report, FD-674, a relevant portion of which is attached as Govt. Ex. C.

After cataloguing the items, TFO Ploch secured the backpack and its contents in SA Dettmering's vehicle. Govt. Ex. E at 3. SA Dettmering and TFO Ploch then transported the backpack to Waukegan Police Department, where TFO Ploch began processing the items of evidentiary value found in the backpack and on defendant's person and listed them in a FD-1087 form, or "Collected Item Log," which is reflected in Govt. Ex. D. In another report form, FD-1036 titled "Fillyaw Arrest / Search Warrant report," TFO Ploch also provided a narrative of the arrest, evidence collected from the backpack, and evidence collected from the search warrant conducted at the defendant's apartment, reflected in Govt. Ex. E.

The guidance set forth in the DIOG was substantially complied with here. TFO Ploch and TFO Kazachenko promptly catalogued items found in defendant's possession during his arrest. Items in the backpack – including not just the narcotics and firearm, but also bank cards, identification cards, U.S. currency, the backpack itself, and a piece of mail – were photographed, *see* Govt. Ex. B, and documented in a FBI photograph log, *see* Govt. Ex. C. As described above, TFO Ploch documented items of evidentiary value located on the defendant's person and in his backpack in a FD-1087, or a "Collected Item Log" in Govt. Ex. D, as well as provided a narrative and summary of the evidence in a report FD-1036 titled "Fillyaw Arrest / Search Warrant report", in Govt. Ex. E. The course of events detailed above reflect the concerted effort by law enforcement to carefully review and document items from the backpack in a prompt manner. Although a written summary of every item was not prepared in a FD-302, FD-597, or FD-653 as required by the DIOG, "minor deviations from department policy do not render an inventory search unreasonable." *Cartwright*, 630 F.3d at 616 (citing *U.S. v. Lomeli*, 76 F.3d 146, 148–49 (7th Cir. 1996)).

In the narrative report of the FD-1036, TFO Ploch described his retrieval of the backpack and stated that he opened the backpack in a "search incident to arrest." Govt. Ex. E at 3. Although this specific verbiage used by TFO Ploch implicates a separate legal analysis, the government expects that if called to testify, TFO Ploch would state that his intention behind opening the backpack was consistent with an inventory search: namely, that he searched the bag to ensure that nothing in the defendant's property could be dangerous to the law enforcement agents who would be transporting the backpack to a secure facility. Furthermore, the defendant was arrested alone, and law enforcement was not going to leave his backpack, contents unknown, sitting in the middle of a residential parking lot. Based on this, TFO Ploch knew that defendant's backpack would need

to be transported in a vehicle with law enforcement, necessitating a review of the backpack's contents to ensure that defendant's property did not contain anything that could be a danger to law enforcement transporting it. This stated intention is squarely in line with the strong governmental interests behind the inventory search exception. *Bertine*, 479 U.S. at 372 ((“[G]uarding the police from danger” is one of the rationales underpinning the inventory search doctrine).

If called to testify, the government expects that TFO Ploch would further state that he was not opening the backpack to search for guns, drugs, or evidence of the crime in the complaint. TFO Ploch would testify that he used the term “search incident to arrest” to describe the actions he took to ensure that the backpack was safe from dangerous weapons, explosives, or other harmful items before placing it in a law enforcement vehicle for transport. Because an officers' subjective motive for the search can be relevant in the context of inventory searches, TFO Ploch's intention behind opening the backpack further supports that the search of the defendant's backpack was a valid inventory search. *See, e.g. Whren v. U.S.*, 517 U.S. 806, 811-12 (1996) (noting that an officer's motive can be relevant in the context of inventory search).

**B. Written Inventory Policies and Procedures Would Have Inevitably Led to the Discovery of the Items in Defendant's Backpack**

In the event that this Court finds that law enforcement did not conduct a lawful inventory search, the FBI's written inventory search policies and procedures would have inevitably led to the discovery of the contraband in defendant's backpack. Under the inevitable discovery doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded “if the government can prove by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means.” *U.S. v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012) (citing *Nix v. Williams*, 467 U.S. 431, 442–44 (1984)). As the Supreme Court has explained, in such a case, “the deterrence rationale has so little basis that the evidence should be received.

Anything less would reject logic, experience, and common sense." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Furthermore, the Supreme Court explained that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id*. at 443. Thus, in performing an analysis under the inevitable discovery doctrine, the "focus is on what would have happened if the illegal search had not aborted the lawful method of discovery." *U.S. v. Markling*, 7 F.3d 1309, 1318 n.1 (7th Cir. 1993).

To satisfy this burden, the government must demonstrate (1) that it had, or would have obtained, an independent legal justification for conducting a search that would have led to the discovery of the evidence, and (2) that it would have conducted a lawful search absent the challenged conduct. *U.S. v. Marrocco*, 578 F.3d 627, 638 (7th Cir. 2009).

The factors set forth in governing Seventh Circuit case law are met here, as the contraband in defendant's backpack would have otherwise been discovered following defendant's lawful arrest during an inventory search, pursuant to established DIOG policy reflected in Govt. Ex. A. *See, e.g., U.S. v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010) ("Of course, by the time [the officer] conducted the actual inventory search here, the gun had already been seized .... But the district court found, based on the evidence and the [police] policy, that an inventory search would have been conducted and that the gun would have been found pursuant to such a search."). Put differently, even if the Court finds that the safety check and inventory that TFO Ploch and TFO Kazachenko performed on the backpack was not consistent with a lawful inventory search, the items in defendant's backpack would have been inevitably discovered a short time later pursuant to the letter of the written guidance in the DIOG. *See, e.g. Cartwright*, 630 F.3d at 616 ("Cartwright

argues that Barleston did not conduct the inventory search properly, failing to make a complete list of the property he found . . . While Cartwright correctly points out that IMPD policy required Barleston to make such a list, Barleston's failure to do so does not undermine the proposition that the police would inevitably have found the gun through a lawful inventory search.").

The DIOG policy specifically states that "Items of personal property removed from a person who has been arrested and is to be incarcerated should be carefully inventoried and promptly, thoroughly searched by agents prior to being stored for safekeeping. The inventory must include both the container and the contents of such containers." Govt. Ex. A. As described above, with the defendant in custody, law enforcement was not going to leave his backpack, contents unknown, in the middle of a residential parking lot after his arrest. If called to testify, the government expects that SA Dettmering, who was the FBI Special Agent leading the operation, would testify that he is familiar with the DIOG, routinely follows the DIOG, and would have conducted an inventory search on Fillyaw's backpack consistent with that policy.

Under the inevitable discovery doctrine, illegally seized evidence need not be suppressed if the government can prove by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 442-44 (1984). As detailed above, if the Court finds that the inventory conducted by TFO Ploch and TFO Kazachenko was an unlawful inventory search, a hearing is not necessary because the DIOG's protocol would have resulted in the inevitable discovery of the contraband from defendant's backpack.

**C. The Search Incident to Arrest Exception is Supported by Seventh Circuit Case Law**

Although TFO Ploch's motivations for inventorying the backpack fell squarely in line with the reasoning behind an inventory search, a search of defendant's backpack incident to his arrest was nevertheless supported by case law in the Seventh Circuit.

During a search incident to a lawful arrest, the police may search not only the person they arrested to ensure he does not have a weapon, but for the same purpose, they can search the area "within his immediate control – the area within grabbing distance – in which a weapon might be concealed that he could attempt to use against the officers or in which there might be evidence of his crime that he could destroy." *U.S. v. Tejada*, 524 F.3d 809, 811 (7th Cir. 2008). As the Supreme Court has recognized, the risks to officers' safety and of evidence destruction are present in all custodial arrests. *Riley v. California*, 573 U.S. 373, 386 (2014) (citing to *U.S. v. Robinson*, 414 U.S. 218 (1973). To mitigate those risks, officers conducting an arrest may search not only the arrestee's person, but also the area "within his immediate control," meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969).

The Seventh Circuit's reasoning in *U.S. v. Tejada* supports the conclusion that the search of Fillyaw's backpack qualifies as a search incident to arrest. In *Tejada*, between 12 to 15 agents entered the defendant's 400 square foot apartment and arrested him relating to a planned purchase of narcotics. *Id.* at 811. The defendant refused to get down on the floor, and also reached for a gun in his waistband. *Id.* The defendant was handcuffed and placed face down on the floor in the kitchen. *Id.* The agents opened a closed cabinet entertainment center in the living room, which was close to the kitchen, and saw a blue travel bag that the agents knew contained narcotics. *Id.* The agents opened the travel bag, opened another bag inside it, and discovered cocaine. *Id.*

The Seventh Circuit concluded that the agents were justified in opening the cabinet of the entertainment center because it was "conceivable though unlikely" that Tejada could have lunged for the entertainment center, opened the cabinet, and grabbed something inside it. *Id.* at 812. In a later opinion, the Seventh Circuit considered the *Tejada* fact pattern when confronted with a

scenario in which an officer first grabbed a purse from a suspect, who fled and was apprehended by a second officer. *Askew-Bell*, 306 Fed.Appx. at 293. The Seventh Circuit concluded that this situation was distinct from *Tejada* because Askew-Bell was not in "grabbing distance" of the purse at the time she was apprehended. *Id.* at 296. A Northern District of Illinois district court's conclusion in *U.S. v. Harris* also highlights that the search incident to arrest analysis focuses on the "grabbing radius" at the time of arrest, not the time of search. In *Harris*, law enforcement executing an arrest warrant apprehended the defendant as he was coming out of his bedroom. *U.S. v. Harris*, 2009 WL 3055331, at *4 (N.D.Ill. Sep. 21, 2009). Because it was uncontested that the defendant was in the bedroom at the time the agents entered the residence and was apprehended coming out of the bedroom, the district court concluded that the bedroom could be searched incident to arrest because it was within defendant's grabbing radius at the time of his arrest. *Id.* The district court concluded that "even though at the time of the search the Defendant was removed from the [grabbing] radius, under *Tejada*, the agents were justified in recovering the gun [in defendant's bedroom]." *Id.* The conclusion from the case law is that the analysis of the area within an arrestee's "immediate control" focuses on where the property was located *at the time of the arrest*. Here, Fillyaw carried the backpack on his person at the time of his arrest, falling within the zone of his immediate control. *U.S. v. Rutley*, 482 Fed.Appx. 175, 177 (7th Cir. 2012) ("The search of Rutley's bag was valid as a search incident to arrest, because the Fourth Amendment permits officers to search, without a warrant, any container carried by an arrestee, including bags, purses, wallets, and books.").

Moreover, moving a backpack a safe distance away to conduct a search incident to arrest, as the agent did with Fillyaw's backpack, does not render the search constitutionally defective. The Seventh Circuit has stated that if officers conduct a search limited to an area under defendant's

control at the time of his arrest, "the fact that it is no longer under his control at the time of the search does not invalidate the search." *U.S. v. Tejada*, 524 F.3d 809, 812 (7th Cir. 2008); *see also U.S. v. Askew-Bell*, 306 F. App'x 292, 296 (7th Cir. 2009) (concluding the same). Consistent with the strong governmental interest in ensuring the safety of officers and others, the Seventh Circuit reasoned in *Tejada* that "if the police could lawfully have searched the defendant's grabbing radius at the moment of arrest, he has no legitimate complaint if, the better to protect themselves from him, they first put him outside that radius." *Tejada*, 524 F.3d at 812. Here, law enforcement's actions fell in line with the reasoning in *Tejada* when they took Fillyaw's backpack a safe distance away – both from Fillyaw and from the apartment building entry area – after Fillyaw was handcuffed and brought to his feet, and then searched the bag within minutes of his lawful arrest. *See also U.S. v. Sanchez*, 2019 WL 3216024, *2 (N.D. Ill. July 17, 2019) (concluding that a search incident to arrest was not defective because the officers searched defendant's bag in defendant's apartment, rather than the alley where they arrested the defendant).

The Seventh Circuit's decision in *U.S. v. Salazar*, which was decided after the events at issue in this case, does not overturn the Court's prior rulings in *Tejada* and *Askew-Bell*. *See U.S. v. Salazar*, 69 F.4th 474, 478 (7th Cir. 2023) ("Our decision in *United States v. Tejada* . . . supports [Salazar's] outcome."). In *Salazar*, the Seventh Circuit upheld a search incident to arrest when officers searched an individual's jacket, where that individual was handcuffed, standing, and adjacent to the jacket with five officers surrounding him - although no officers were standing between him and the jacket. *U.S. v. Salazar*, 69 F.4th 474 (7th Cir. 2023). The Seventh Circuit explained that the search of Salazar's jacket was like the search of the entertainment center in *Tejada*: "Although both arrestees were cuffed, surrounded by police, and unlikely to lunge at the

search area, such a lunge was possible because both arrestees were unpredictable and adjacent to the area the officers searched." *Id.* at 478.

The search of Fillyaw's backpack is analogous to the circumstances surrounding the search of the jacket in *Salazar* and the search of the entertainment center in *Tejada*, including that Fillyaw was surrounded by police, handcuffed and as a result, unlikely to access his backpack. Like in *Tejada* and *Salazar*, law enforcement did not know Fillyaw's strength or what other contraband he had easily accessible to him. However, unlike in *Tejada* where the arrestee would have to lunge across a room to open up an entertainment center and pull out a gun, Fillyaw would only need to reach behind for his backpack, which was strapped to his person. In addition, although Fillyaw was face-down on the ground and surrounded by armed law enforcement, he was not handcuffed until approximately 33 seconds after law enforcement confronted him and, from a mobility standpoint, was still able to grab for his backpack until it was taken off his back approximately 25 seconds after law enforcement confronted him. As became evident during the later search, defendant's firearm was situated in his backpack underneath a pair of his pants, lodged directly next to the opening zipper of his backpack, and immediately accessible if opened.




Defendant cites to the *Salazar* court's reference to *U.S. v. Davis*, 997 F.3d 191 (4th Cir. 2021). However, the Seventh Circuit's reference to *Davis* was limited in scope. Specifically, the *Salazar* court referenced *Davis*, which had been cited in support by Salazar, to distinguish facts: that in *Davis*, the arrestee had been cuffed, was faced down on the floor, and was severely curtailed in the distance he could reach, compared to Salazar who was standing, agitated and adjacent to the jacket. *Salazar*, 69 F.4th at 477. It is a bridge too far to conclude that the Seventh Circuit would

therefore find that a search incident to arrest was unreasonable for any arrestee who was cuffed, face down, and severely curtailed in the distance he could reach. Indeed, *Salazar*'s citation to its continued agreement with the *Tejada* decision forecloses that conclusion: the arrestee in *Tejada*, like in *Davis*, was cuffed, face down on the floor, and surrounded by police. Moreover, the Seventh Circuit in *Salazar* specifically rejected the proposition that for a search incident to arrest to be lawful, the arrestee must be both unsecured *and* within reaching distance of the area to be searched, and reaffirmed its commitment to an objective analysis under a "totality of the circumstances" approach. *Id.* at 478. ("[T]hese issues are not standalone elements of a two-part test – they are factors that bear on the totality of the circumstances, under which a search is reasonable or not.").

In this case, the defendant was arrested with a backpack on his back, which was within his immediate control at the time of his arrest and searched within two minutes of that arrest. In light of binding Seventh Circuit case law, the facts support that this was a lawful search incident to arrest.

## IV. CONCLUSION

For the foregoing reasons, this Court should deny defendant's motion to suppress.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: */s/ Kirsten Moran*
KIRSTEN MORAN
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 722-2291

Dated: June 7, 2024